# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DEVORAH CRUPER-WEINMANN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | Case No. 13 Civ. 7013 (JSR) |
| Plaintiff, | ) ) | **AMENDED CLASS ACTION COMPLAINT** |
| v. | ) ) | |
| PARIS BAGUETTE AMERICA, INC. d/b/a PARIS BAGUETTE, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

Plaintiff, by her attorneys, states as follows for her Amended Class Action Complaint against Defendant Paris Baguette America, Inc. d/b/a Paris Baguette ("Defendant" or "Paris Baguette"):

## NATURE OF THE CASE

1.     This is a class action based upon Defendant's violation of the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq., as amended*.  FACTA is designed to protect credit and debit cardholders from identity theft and fraud.  The statute prohibits merchants who accept credit cards or debit cards (the "Cards") from issuing electronically generated receipts at the point of sale that display the expiration date, thus limiting an identity thief's ability to obtain the consumer's account information, among other things.

2.     Paris Baguette violated FACTA repeatedly by printing the Card expiration date on sales receipts issued to its customers at the point of sale.

3.     Paris Baguette was well aware of FACTA from numerous sources including, but not limited to, its contracts with Visa, MasterCard, etc. and its insurance policies.   Paris Baguette's partial compliance with the law is proof of that awareness.

4.     Plaintiff seeks, on behalf of herself and the class, statutory damages, punitive damages, costs, and attorneys fees, all of which are made expressly available by statute, 15 U.S.C. §1681 *et seq.*

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1337, and 15 U.S.C. §1681p, which provides that "[a]n action to enforce any liability created under this title may be brought in any appropriate United States district court, without regard to the amount in controversy . . . ."

6.     Venue in this district is proper pursuant to 28 U.S.C. §1391 because Defendant transacts business in this District.

## PARTIES

7.     Plaintiff purchased food at Paris Baguette's midtown Manhattan location on September 19, 2013, paid for the food with a credit card, received an electronically printed receipt displaying the expiration date at the point of sale, and was damaged thereby.

8.     Defendant Paris Baguette America, Inc. d/b/a Paris Baguette is a New Jersey corporation authorized to transact business within the State of New York.   During the time period relevant here, Paris Baguette owned and operated four restaurants in this District, as well as four others in the State of New York, and at least 25 others throughout the United States, including the states of California, Georgia, Massachusetts, New Jersey and Pennsylvania.

9.     At all relevant times, Paris Baguette was a "person that accepts credit cards or debit cards for the transaction of business" within the meaning of FACTA.

## CLASS ALLEGATIONS

10.     This action is brought on behalf of Plaintiff individually and as a class action on behalf of all persons or entities to whom Paris Baguette provided an electronically printed receipt at the point of sale or transaction, in a sale or transaction occurring after October 3, 2008, which receipt displayed the expiration date of the customer's credit card or debit card.  Excluded from the Class are the officers and directors of Paris Baguette at all relevant times, members of its immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Paris Baguette has or had a controlling interest.

11.     Paris Baguette has numerous restaurants that serve hundreds, if not thousands, of meals that have been paid for with debit cards and credit cards.  Paris Baguette printed the card receipts at the point of sale and those receipts showed the Card expiration date.  Accordingly, joinder of all individual members would be impracticable.  Paris Baguette used standardized computer software to print the receipts and that software printed the receipts the same way for each transaction.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes there are thousands of members of the Class.  Members of the Class may be identified from records maintained by Paris Baguette and its Card processing company and may be notified of the pendency of this action by United States mail.

12.     Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Paris Baguette's wrongful conduct in violation of federal law that is complained of herein.

13.     There are common questions of law and fact affecting members of the class, which common questions predominate over questions that may affect individual members. These include the following:

(a)     Whether Paris Baguette provided customers with electronically printed receipts at the point of sale which show the expiration date;

(b)     Whether Paris Baguette's conduct was willful, knowing or reckless; and

(c)     Whether Plaintiff and the other members of the class are entitled to statutory damages, punitive damages, costs, or attorneys fees for Paris Baguette's acts and conduct.

14.     Plaintiff will fairly and adequately represent the class members.  Plaintiff has no interests that conflict with the interests of other class members.  Plaintiff has retained counsel competent and experienced in the prosecution of class action litigation.

15.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FACTS

**PLAINTIFF'S TRANSACTION**

16.     On September 19, 2013, Plaintiff ate at Paris Baguette's 6 West 32nd Street, New York, New York location, paid for her meal with a credit card, and received an electronically printed receipt displaying the expiration date.

17.     At the time of Plaintiff's transaction described above, Paris Baguette routinely gave receipts to its customers at the point of sale at its various retail stores which displayed the

expiration dates of the customers' credit and/or debit cards, in violation of the requirements of FACTA.

**CONGRESS PASSED FACTA TO PREVENT RISK OF IDENTITY THEFT**

18.     At the time of FACTA's passing, it was clear that identity theft based on credit and debit card fraud was a huge risk in the United States.  The Federal Trade Commission estimates that over 9 million persons each year have their identity assumed by criminals for financial gain, causing losses in excess of $50 billion.

19.     One common modus operandi of identity thieves is to obtain Card receipts that are lost or discarded, or through theft, and use the information on them to engage commit fraud and theft.  Identity thieves who do this are known as "carders" and "dumpster divers."  This modus operandi is more common than the use of sophisticated electronic means to obtain the information.  Robin Sidel, "Identity Theft—Unplugged. Despite the High-Tech Threat, When You Get Ripped Off It's Usually Still the Old Way," WALL STREET JOURNAL, Oct. 5, 2006, p. Bl.

20.     In early 2003, the payment card industry and Congress announced that they were working together to combat identity theft.  A critical part of this joint effort was the truncation of personal data from Card receipts presented to consumers at the point of sale.

21.     On March 6, 2003, Visa CEO Carl Pascarella held a joint press conference with Senators Judd Gregg, Jon Corzine, Patrick Leahy, and Dianne Feinstein to announce Visa USA's new account truncation program to protect consumers from identity theft.   At the press conference, Mr. Pascarella stated:

> Today, I am proud to announce an additional measure to combat identity theft and protect consumers.  Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts.  The card's expiration date will be eliminated from receipts altogether . . . .

The first phase of this new policy goes into effect July 1, 2003 for all new terminals.  I would like to add, however, that even before this policy goes into effect, many merchants have already voluntarily begun truncating receipts, thanks to the groundwork that we began together several years ago.

. . . .

Visa USA is pleased to be working with Senator Feinstein, and the other senators here today in the fight to protect consumers from identity theft.  After all, we share the same goals.

22.     On July 9, 2003, L. Richard Fischer presented a written statement to the United States House of Representatives Committee on Financial Services on behalf of Visa USA, supporting the truncation requirements of what ultimately became FACTA.  Therein, Mr. Fischer stated:

> Although Visa generally believes that the details of preventing identity theft should be left to financial institutions that are best suited to address ever evolving fraud techniques, Title II could provide important benefits to consumers and financial institutions alike by establishing workable identity theft provisions and ensuring that these provisions benefit from national uniformity.  For example, Section 203 of Title II would prohibit any merchant or other entity that accepts credit and debit cards from printing more than the last four digits of the card account number or the expiration date upon receipts provided to cardholders at the point of sale.

23.     Merchants generally will not honor a Card in a card-not-present transaction (telephone, internet, or fax) without both the correct expiration date and the card number.  The expiration date is almost always necessary for misuse of a Card.

24.     Identity thieves commonly obtain Card receipts that are lost or discarded, or through theft, and use the information to engage in unauthorized credit or debit transactions.

25.     Also, sophisticated identity thieves can find a Card number using the expiration date and the last five digits of the card number, or more easily obtain sufficient information to use another's credit card or debit card.

**CONGRESS ACTED TO STEM CREDIT CARD FRAUD IN 2003**

26.     The Fair and Accurate Credit Transactions Act was passed by Congress on November 22, 2003, and signed by President Bush on December 4, 2003, to assist in the prevention of identity theft and credit and debit card fraud.  The statute makes it more difficult for identity thieves to obtain consumers' Card information by reducing the amount of information identity thieves could retrieve from found or stolen Card receipts.  In his statement during the signing of the bill, President Bush declared that:

> This bill also confronts the problem of identity theft.  A growing number of Americans are victimized by criminals who assume their identities and cause havoc in their financial affairs.  With this legislation, the federal government is protecting our citizens by taking the offensive against identity theft.

27.     The main provision of FACTA (codified as 15 U.S.C. §1681c(g) of the Fair Credit Reporting Act) provides that:

> [N]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

28.     FACTA details the liability for willful noncompliance:

> §1681n.  Civil liability for willful noncompliance
>
> (a) In general, any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of –
>
> > (1)
> >
> > > (A) Any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
> > >
> > > . . . .
> >
> > (2)    such amount of punitive damages as the court may allow; and

(3)   in the case of any successful action to enforce any liability under this section, the costs of this action together with reasonable attorneys fees as determined by the court . . . .

**PARIS BAGUETTE'S CONDUCT HARMED PLAINTIFF BY VIOLATING HER SUBSTANTIVE RIGHTS, EXPOSING HER TO INCREASED RISK OF IDENTITY THEFT**

29.   The rights conferred to Plaintiff by FACTA are concrete and substantive, and not merely procedural in nature.  This is because extensive findings by Congress have demonstrated that Paris Baguette's conduct here created a real, non-speculative harm in the form of increased risk of identity theft.  As the Court observed in *Altman v. White House Black Mkt., Inc.*, No. 1:15-cv-2451-SCJ, 2016 U.S. Dist. LEXIS 92761, at *22 (N.D. Ga. July 13, 2016), a claim alleging a FACTA violation is concrete under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), "because of the Congressional creation of a right and injury, as well as the language of the Senate Report which indicates that Congress did not find the risk of identity theft to be speculative."

30.   The *Altman* Court's reasoning was echoed in an even more recent decision in another FACTA case, *Guarisma v. Microsoft Corp.*, No. 1:15-cv-24326-CMA, 2016 U.S. Dist. LEXIS 97729, at *6–13 (S.D. Fla. July 26, 2016).  The *Guarisma* Court concluded that, because FACTA's legislative history reveals Congress's "desire[] to create a substantive legal right for consumers to utilize in protecting against identity theft," a merchant's violation of FACTA results in an injury that is "concrete as soon as [that] company prints the offending receipt . . . ." 2016 U.S. Dist. LEXIS 97729, at *11–12.

31.   The risk of identity theft emanating from Paris Baguette's FACTA violations is not merely speculative, because Congress found risk of identity theft from the prohibited conduct was not merely hypothetical, and Congress's determinations deserve special deference.  At the

time FACTA was passed, the United States Senate Committee on Banking, Housing, and Urban Affairs (the "Senate") released its report of factual findings, S. Rep. No. 108-166 (2003), which found, among other things, that "[m]illions of Americans have already been victimized by identity theft," and "so many will become victims despite the best efforts of businesses and law enforcement . . . ." S. Rep. 108-166, at 8.

32.    Moreover, the Senate made it clear that the enhanced risk of identity theft from the <u>specific</u> conduct complained of here exposed consumers, like Plaintiff, to the very harm that FACTA sought to prevent. S. Rep. 108-166, at 3 ("The bill contains numerous measures which protect consumers from identity thieves. The legislation requires the truncation of credit and debit card account numbers on electronically printed receipts to prevent criminals from obtaining easy access to such key information.").

33.    Far from attenuated and unlikely, the Senate made it clear that the risk of identity theft emanating from a FACTA violation like this one is real and imminent. S. Rep. 108-166, at 8 ("Due to the significant costs to consumers and to the economy, and because of the constant efforts of criminals to find new victims, it is vitally important to address measures which will help prevent identity theft and to punish identity thieves.") (emphases added).

34.    Finally and most importantly, the Senate found that the specific provision at issue here protected consumers, like Plaintiff, from an intangible harm in the form of enhanced risk of identity theft. As the Senate noted, "[t]he Committee included this provision to limit the number of opportunities for identity thieves to 'pick off' key card account information." S. Rep. 108-166, at 13.

35.    Congress knew that only persons in Plaintiff's position (those who received from a merchant printed credit/debit card receipts bearing the consumer's private financial

9

information) would suffer harm, and that they would specifically suffer the harm Congress had contemplated (the possibility that identity thieves would be able to piece together credit card numbers and expiration dates to invade consumers' privacy and exploit their financial resources). Thus, "there is a tight connection between the type of injury which [Plaintiff] alleges and the fundamental goals of the statute[] which [she] sues under—reinforcing [her] claim of cognizable injury." *Baur v. Veneman*, 352 F.3d 625, 635 (2d Cir. 2003).

36.     Further, the United States Department of Justice ("DOJ") has explained the mechanism by which Paris Baguette's violations have increased Plaintiff's risk of identity theft by confirming the causal link between the information protected by FACTA and credit card identity theft.   In *Papazian v. Burberry Ltd.*, No. 2:07-cv-01479-GPS-RZ (C.D. Cal.), for example, the DOJ filed a brief that explained the purpose of FACTA and why compliance is so important:

> The goal of the provision that became §1681c(g) was "to limit the opportunities for identity thieves to 'pick off' key card account information."  S. Rep. No. 108-166 (2003).  FACTA followed enactment of laws in at least 20 states with provisions similar to §1681c(g) that prohibited printing the full card number as well as the expiration date on receipts. . . .
>
>      . . . .
>
> Defendant's argument that a thief would not be able to make fraudulent charges using *only* a truncated card number and the full expiration date misses the point.  Thieves might piece together (or 'pick-off,' in the words of Congress) different bits of information from different sources. . . .  Congress' actions comport with common experience, testimony provided in support of the legislation, and the instructions credit card companies give to merchants. . . .

Brief in Support of Statute by United States of America as Intervenor at 13–16, *Papazian v. Burberry Ltd.*, No. 2:07-cv-01479-GPS-RZ (C.D. Cal. July 24, 2007) (emphasis added), *filed as* Exhibit A to Ex Parte Application to Intervene, ECF No. 24 ("DOJ FACTA Brief").

## THE HARM THAT PLAINTIFF ALLEGES HAS A CLOSE RELATIONSHIP WITH A TRADITIONAL HARM

37.     As the Supreme Court made clear in *Spokeo*, it is instructive "whether [the] alleged intangible harm [here] has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549 (citing *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)).

38.     Congress's ability to define the boundaries of a party's privacy rights stems from ancient legal concepts.[1]   The right of privacy is "derived from natural law," and was recognized by Roman and early-English jurisprudence.  *Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68, 70 (Ga. 1905), *cited with approval in Ali v. Playgirl, Inc.*, 447 F. Supp. 723, 731 (S.D.N.Y. 1978); *see also* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 195 (1890) ("[N]umerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'").

39.     Moreover, and especially relevant here, English common law has traditionally recognized a specific right to privacy of information pertaining to individuals' financial accounts.   In 1923, the English Court of Appeal identified the common-law right to strict confidence of bank account information, arising from an implied contractual duty of nondisclosure.  *See Tournier v. Nat'l Provincial & Union Bank of Eng.*, (1924) 1 K.B. 461, *cited with approval in Sec. & Exch. Comm'n v. Gib. Global Sec., Inc.*, No. 13 Civ. 2575 (GBD) (JCF), 2015 U.S. Dist. LEXIS 43773, at *7 (S.D.N.Y. Apr. 1, 2015).

---

[1]   For a more thorough discussion of this topic, see Post-Argument Letter Brief by Amicus Curiae Public Justice, P.C., *Cruper-Weinmann v. Paris Baguette Am., Inc.*, No. 14-3709 (2d Cir. June 17, 2016).

**RISK OF IDENTITY THEFT CONTINUES TO BE A REAL PROBLEM**

40.     Far from speculative, identity theft is a problem so pervasive in America that it has topped the Federal Trade Commission's list of consumer complaints for 15 years.[2]  As the DOJ found in its report "Victims of Identity Theft, 2014," an estimated 17.6 million persons, or 7% of all U.S. residents age 16 or older, were victims of one or more incidents of identity theft in 2014.[3]  The majority of these identity theft victims (86%) experienced the fraudulent use of existing account information, such as credit card or bank account information.  As a result, in 2014 <u>alone</u>, 3% of <u>all Americans</u> experienced at least one incident of the misuse of an existing credit card account.  This amounted to almost 8.6 million victims, a slight increase from 7.7 million victims in 2012.

**FACTA WAS EXTENSIVELY ADVERTISED AND
PHASED IN OVER A THREE-YEAR PERIOD**

41.     FACTA's requirement that merchants not print credit and debit card expiration dates was phased in over a three-year period, until December 4, 2006.  During the three-year phase-in period, there was extensive publicity regarding the law's requirements.

42.     In the January 2005 edition of the Massachusetts Restaurant Association Newsletter, an article appeared apprising Association members that both Visa and MasterCard require truncation of the entire expiration date and all but the last four digits of the cardholder account number.

---

[2]   *See* Press Release, Fed. Trade Comm'n, "FTC Releases Annual Summary of Consumer Complaints" (Mar. 1, 2016), *available at* https://www.ftc.gov/news-events/press-releases/2016/03/ftc-releases-annual-summary-consumer-complaints.

[3]   Bureau of Justice Statistics, U.S. Dep't of Justice, "Victims of Identity Theft, 2014" (Sept. 2015), *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf.

43.     The April 2005 edition of the FOOD INDUSTRY ADVISOR, the newsletter for the Pennsylvania Food Merchants Association and Pennsylvania Convenience Store Council, included an article regarding the requirements of credit card truncation under FACTA which included the following language:

> [A]ccording to the FACT Act, "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction. . . ."

This same article appeared in the April 2005 Edition of the NACS Magazine, published by the National Association of Convenience Stores.

44.     The Independent Insurance Agents & Brokers of America circulated a report to its members dated June 5, 2010 titled: "Overview of the Fair Credit Reporting Act, The Fair and Accurate Credit Transactions Act, and the Drivers Privacy Protection Act."  In relevant part, this publication stated:

> Under the FACTA Act, businesses and others accepting credit or debit cards for payment may not print more than the last five digits of the card number nor may they print the expiration date upon any receipt provided to the cardholder at the point of sale.

45.     The Office of Thrift Supervision, United States Department of Treasury ("OTS"), is responsible, *inter alia*, for monitoring financial institution compliance with FACTA.  Toward this end, the OTS publishes an Examination Handbook ("Handbook"), which assists OTS field personnel when they perform an examination, or compliance audit, of a given financial institution.  The April 2011 edition of the Handbook states, in relevant part:

> **<u>Truncation of Credit and Debit Card Account Numbers</u>**
>
> Ensure that electronically generated receipts from ATM and POS [("point of sale")] terminals or other machines do not contain more than the last five digits of the card number and do not contain the expiration dates.

13

46.     Many restaurant and retail trade associations apprised their merchant members that FACTA requires truncation of the entire expiration date and all but the last five digits of the cardholder account number.

47.     For example, the cover-article in the Winter 2007 edition of TEXAS BUSINESS TODAY includes an extensive discussion of the truncation requirements of FACTA.

## CONGRESS WAS FORCED TO CLARIFY THE FACTA PROHIBITIONS IN 2008

48.     Merchants, however, claimed to have misunderstood FACTA, despite its being unambiguous.  They had truncated the credit card number, but had printed the expiration date.

49.     On June 3, 2008, in the face of an avalanche of class action lawsuits against such noncomplying merchants, House Bill HR 4008 (known as the Credit and Debit Card Receipt Clarification Act of 2007, Pub. L. 110-241, §3(a), 122 Stat. 1565, 1566 (June 3, 2008)) (the "Clarification Act") (codified as 15 U.S.C. §1681n(d)), was passed by Congress and signed into law by the President.

50.     The Clarification Act did not change FACTA, 15 U.S.C. §1681c(g).

51.     The Clarification Act provided amnesty to those merchants that had printed expiration dates on electronically printed receipts prior to June 3, 2008.  The Clarification Act was essentially a "get out of jail free card" for noncomplying merchants.

52.     But the Clarification Act does not protect those merchants that have printed expiration dates on credit/debit card receipts after June 4, 2008.

53.     The Clarification Act also made clear that partial compliance by redacting the credit or debit card number, but not the expiration date, fails to comply with FACTA.

54.     Congress, although faced with numerous class actions seeking statutory penalties from FACTA-violating merchants, did not change the penalty provisions.  Thus, Congress made clear that it expected consumers to enforce FACTA by filing class actions.

55.     Indeed, since the statutory penalty for willful non-compliance is only $100 to $1,000, class actions are the only viable means for private enforcement.

56.     The passage of the Clarification Act was championed by the pro-business lobbying organization Chamber of Commerce and added to the extensive amount of publicity regarding the requirements of FACTA.

57.     In May 2007, the Federal Trade Commission published a widely circulated and extensively publicized FTC Business Alert that reiterated the truncation requirements of FACTA.

58.     Moreover, in July 2007 the DOJ stressed the importance of not printing expiration dates in its brief in the private FACTA action *Papazian*:

> Congress sought with FACTA to "assist[] consumers in preventing identity theft and for mitigating its consequences once the crime has occurred." *See* 108 H. Rep. No. 263 (2003).  The goal of the provision that became §1681c(g) was "to limit the opportunities for identity thieves to 'pick off' key card account information."  S. Rep. No. 108-166 (2003).  FACTA followed enactment of laws in at least 20 states with provisions similar to §1681c(g) that prohibited printing the full card number as well as the expiration date on receipts. . . .
>
> . . . .
>
> Defendant claims that expiration dates accompanied only by truncated card numbers need no protection from would-be fraudsters.  Defendant submitted with its opposition to Plaintiff's motion the declaration of a former MasterCard employee who stated that a full expiration date and a truncated card number cannot be used to make fraudulent transactions. . . .  Defendant also contends, based on the same declaration, that card companies routinely complete transactions with incorrect expiration dates so long as the expiration date provided to the merchant is in the future. . . .
>
> . . . .

Defendant's argument that a thief would not be able to make fraudulent charges using <u>only</u> a truncated card number and the full expiration date misses the point. Thieves might piece together (or 'pick-off,' in the words of Congress) different bits of information from different sources. The expiration date of a customer's credit/debit card, until recently printed on Defendant's receipts, is one of several pieces of information that can make it easier for criminals to rack up fraudulent charges. These dates are worth protecting even when not accompanied by other important financial information. . . .

Congress' actions comport with common experience, testimony provided in support of the legislation, and the instructions credit card companies give to merchants. . . .

DOJ FACTA Brief at 13–16.

59.   Now, more than five years after the passage of the Clarification Act, and ten years after the passage of FACTA, merchants still fail to comply. By failing to comply, Paris Baguette has deprived consumers of the protections that the statute was designed to confer, and exposes cardholders to increased risk of identity theft.

## PARIS BAGUETTE HAD ACTUAL KNOWLEDGE OF FACTA

60.   Paris Baguette had actual knowledge of FACTA's truncation requirements specifically, including the requirement that Card numbers be suppressed and that expiration dates not be printed on receipts presented to consumers at the point of sale. Paris Baguette's partial compliance with FACTA when it redacted all but the last few digits of the Card number is proof of that knowledge.

### Paris Baguette Learned Of FACTA From Its Card Issuers

61.   VISA, MasterCard, the PCI Security Standards Council (a consortium founded by VISA, MasterCard, American Express, and JCB), companies that sell cash registers and other devices for the processing of credit card and debit card payments, and other entities directly informed Paris Baguette about FACTA, including its specific requirements concerning the

redaction of credit card and debit card numbers and prohibition of the printing of expiration dates.

62.     Paris Baguette accepts Discover, American Express, Visa, and MasterCard branded credit and debit cards.

63.     Upon information and belief, during all times relevant to this Complaint, Paris Baguette had contracts with their Card issuers, including VISA, MasterCard, American Express, and others, and those contracts prohibited Paris Baguette from printing Card expiration dates.

64.     Visa USA's contracts with the American merchants that accept Visa brand Cards are defined in part in a manual entitled CARD ACCEPTANCE GUIDELINES FOR VISA MERCHANTS ("Visa Rules").  The following language appears in the 2011 edition:

> *The Card Acceptance Guidelines for Visa Merchants* is a comprehensive manual for all businesses that accept Visa transactions in the card-present and/or card absent environment. The purpose of this guide is to provide merchants and their back-office sales staff with accurate, up-to-date information and best practices to help merchants process Visa transactions, understand Visa products and rules, and protect cardholder data while minimizing the risk of loss from fraud.

65.     Under the heading "Visa Rules," (page 11), the 2011 edition states that "Merchants must follow basic card acceptance rules for all Visa transactions."

66.     Visa Rules (page 13) prohibits the printing of the expiration date on Card receipts:

**Suppressed Account Number and Expiration Date**

Ensure that the Visa account number is suppressed in accordance with Visa rules and local laws and regulations.  Visa recommends that all but the last four digits of the account number be suppressed on the cardholder copy of the transaction receipt, unless otherwise required under local law.

**The expiration date should not appear at all on the cardholder copy of the transaction receipt.**  Existing point-of-sale terminals must comply with these requirements.  To ensure that your point-of-sale terminals are properly set up for account number and expiration date suppression, contact your acquirer. (Emphasis added.)

67.     The truncation standards set forth in the Visa Rules are part of the contract between Visa and the merchants which accept its Cards, here, Paris Baguette.

68.     Similarly, MasterCard's agreements with the American merchants which accept MasterCard brand credit or debit cards are defined in part in a manual entitled SECURITY RULES AND PROCEDURES, Merchant Edition ("MasterCard Rules").  The language below appears in the edition dated August 30, 2013.

69.     Under the heading "Customer Obligations, 1.1 Compliance with the Standards," (page 1), it states that "This manual contains Standards.  Each Customer must comply fully with these Standards."

70.     MasterCard Rules (pages 3–8) prohibits the printing of the expiration date on credit/debit card receipts:

### 3.11.4  Primary Account Number Truncation and Expiration Date Omission

The Cardholder and Merchant receipts generated by all electronic POS Terminals, whether attended or unattended, cash disbursement receipts generated by electronic POS Terminals at financial institutions, and each printed ATM Terminal receipt must omit the Card expiration date.  In addition, the Cardholder receipt generated by all electronic POS Terminals, whether attended or unattended, and each printed ATM Terminal receipt must reflect only the last four (4) digits of the PAN.  All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.  (emphasis added.)

71.     The truncation standards set forth in the MasterCard Rules are part of the contract between MasterCard and the merchants that accept its debit and/or credit cards—here, Paris Baguette.

72.     Prior to the transaction at issue, Paris Baguette:

    a.   Received periodic communications from credit card issuers advising them to not print Card expiration dates;

b.  Received monthly statements from its merchant bank (or other similar entity that performed credit and debit card payment clearing services for Paris Baguette) which apprised Paris Baguette of its obligation to not print Card expiration dates;

c.  Received written information from its POS provider(s) apprising Paris Baguette to not print Card expiration dates; and,

d.  Received information from trade associations and/or other similar entities apprising Paris Baguette of its obligation to not print Card expiration dates.

**Not To Print Expiration Dates Was So Obvious That It Should Have Been Known**

73.  Proof of Paris Baguette's knowledge of the FACTA requirements is evidenced by its change to the Card receipts to remove all but the last four digits of the Card number.

74.  FACTA, 15 U.S.C. §1681c(g)(1), provides that:

[N]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.

75.  The entire FACTA prohibition consists of only 45 words and is pellucid.  Of those 45 words, Paris Baguette complied with all but four words—"or the expiration date."

76.  Paris Baguette's complying with the first 26 words and the last 15 words, while printing the expiration date—the middle four words—was objectively unreasonable.

77.  Paris Baguette's failure to suppress the expiration date was reckless because it was an action entailing "an unjustifiably high risk of harm that is either known <u>or so obvious that it should have been known</u>."[4]

---

[4]  *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 68 (2007) (emphasis added) (internal quotation marks and citation omitted).

78.     Paris Baguette should, therefore, be held civilly liable.[5]

**Paris Baguette Declined Insurance Coverage For FACTA Violations**

79.     On November 26, 2013, counsel for Paris Baguette's insurance carrier, Leading Insurance Services, Inc., notified Plaintiff's counsel that it was denying coverage to Paris Baguette because, among other things, the insurance policy specifically excludes violations of the Fair and Accurate Credit Transactions Act.

80.     Commercial insurance coverage is negotiated for and bound only by the signature of senior management and the specifics of the coverage are closely monitored.

81.     In addition, the exclusions from an insurance policy can often be added back in by riders—at additional cost.  That is part of the negotiation.

82.     Paris Baguette's refusal to insure for a liability that it was aware of—FACTA— was reckless.

**BOTH THE CARD NUMBER AND THE EXPIRATION DATE MUST BE SUPPRESSED**

83.     Congress dealt with Card-accepting merchants' failure to comply with FACTA in 2008.  After thousands of merchants had been sued in class actions for their failure to suppress both the card number and expiration date, Congress merely gave those merchants more time to comply.  Congress did not accede to the merchants' demands that it remove the requirement that both numbers be suppressed.

84.     Numerous sources of information detailed above further informed Paris Baguette of its need to suppress both the Card number and expiration date.

---

[5]  *Id.* at 68 n.18 ("Unlike civil recklessness, criminal recklessness also requires subjective knowledge on the part of the offender." (citations omitted)).

85.     Paris Baguette demonstrated actual knowledge of FACTA when it partially complied with the statute by suppressing all but the last few digits of the Card number.

86.     Paris Baguette did not suppress the Card's expiration date.

87.     All three Courts of Appeal that have decided FACTA cases have done so based on that defendant's explanation detailing why its interpretation of FACTA was objectively reasonable.[6]

88.     Paris Baguette has provided no objectively reasonable explanation of why it failed to suppress the printing of the expiration date.  Paris Baguette's printing of the expiration date was objectively unreasonable and reckless and, therefore, was willful.

## COUNT I

## VIOLATION OF FACTA

89.     Plaintiff hereby incorporates by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

90.     Paris Baguette accepts credit cards and debit cards in the course of transacting business with persons such as Plaintiff and the other class members.  In transacting such business, Paris Baguette uses cash registers or other machines or devices that print receipts electronically for credit card and debit card transactions.

---

[6]  *See Hammer v. Sam's E., Inc.*, 754 F.3d 492, 502 (8th Cir. 2014) ("Thus, even when a court disagrees with a party's interpretation of FACTA, it may not impose liability unless the party has interpreted the statute in an objectively unreasonable manner." (citing *Safeco*, 551 U.S. at 69 (concluding that Safeco's violation was not reckless because its "reading of the statute, albeit erroneous, was not objectively unreasonable"))); *Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486, 489 (7th Cir. 2012) ("[T]he fact that the [middle] four digits [of the primary account number] Shell exposed on the receipt created no greater risk for its customers than printing the last four digits of the primary account number means that Shell's decision cannot be called 'objectively unreasonable.'"); *Long v. Tommy Hilfiger U.S.A., Inc*., 671 F.3d 371, 373, 377 (3d Cir. 2012) (printing the month of a credit card's expiration date, but not the year, was not a willful violation, even though §1681c(g) prohibits printing any portion of a card's expiration date, because the defendant's interpretation of the statute was not "objectively unreasonable").

91.     After June 3, 2008, the deadline for compliance as extended by the Clarification Act, Paris Baguette, at the point of sale or transaction, provided Plaintiff and the other class members with electronically printed receipts, each of which included the credit or debit card expiration date.

92.     Paris Baguette knowingly or recklessly printed the Card expiration dates on the Card receipts.

**WHEREFORE**, Plaintiff requests the Court to enter judgment in favor of Plaintiff and the class members and against Paris Baguette jointly and severally, as follows:

a. Statutory damages of $100 to $1,000 per violation;

b. Attorneys fees, litigation expenses, and costs;

c. Such other and further relief as the Court may deem proper, including punitive damages.

Dated: New York, New York
       July 28, 2016

**FRANK LLP**

By:    */s/  Marvin L. Frank*
Marvin L. Frank (MF1436)
Gregory A. Frank (GF0207)
275 Madison Avenue, Suite 705
New York, New York 10016
(212) 682-1853 Telephone
(212) 682-1892 Facsimile
mfrank@frankllp.com
gfrank@frankllp.com

**NABLI & ASSOCIATES, P.C.**
60 East 42nd Street, Suite 1101
New York, New York 10165
(212) 808-0716 Telephone
(212) 808-0719 Facsimile
Khaled (Jim) El Nabli
Jim_ElNabli@NabliLaw.com

Joseph H. Lilly JoeLilly@att.net
Alan J. Harris AlanHarrisEsq@aol.com
Peter Y. Lee Peter.Lee@LeeAdvocates.com

*Counsel for Plaintiff and the Class*